IN THE MATTER OF THE APPLICATION OF BOARDWALK
REGENCY CORPORATION FOR A CASINO LICENSE.

Argued March 22, 1982—Decided July 21, 1982.

362

*William R. Glendon,* a member of the New York bar, argued the cause for applicant-appellant and cross-respondent Boardwalk Regency Corporation and appellants and cross-respondents Caesars World, Inc. and Caesars New Jersey, Inc. (*Wilentz, Goldman & Spitzer,* attorneys; *William R. Glendon, Guy C. Quinlan* and *Robert A. Rabbino, Jr.,* members of the New York bar, and *Morris Brown* and *Brian J. Molloy,* of counsel).

*Irving Younger,* a member of the New York and District of Columbia bars, argued the cause for appellants and cross-respondents Clifford S. Perlman and Stuart Z. Perlman (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Irving Younger, Edward Bennett Williams, Harold Unger* and *Robert B. Barnett,* members of the District of Columbia bar, of counsel; *Clyde A. Szuch, Murray J. Laulicht, Marc S. Klein* and *Stuart M. Feinblatt,* on the briefs).

*Michael R. Cole,* Assistant Attorney General, argued the cause for respondent and cross-appellant Attorney General of New Jersey (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Deputy Attorney General, on the briefs).

*Robert J. Genatt,* General Counsel, argued the cause for respondent and cross-appellant New Jersey Casino Control Commission (*Mr. Genatt,* attorney; *Robert J. Genatt, Thomas N. ⸱ uriemma, Dennis Daly* and *Edward R. Hannaman,* on the briefs).

The opinion of the Court was delivered by

CLIFFORD, J.

Boardwalk Regency Corporation (BRC) applied for a plenary license pursuant to the Casino Control Act, *N.J.S.A.* 5:12–1 to –152 (Act). After conducting investigations and hearings on the

application, the Casino Control Commission (Commission) found that two of the directors of BRC, Clifford S. and Stuart Z. Perlman, had failed to satisfy the standards set forth in the Act regarding "casino key employees." See *N.J.S.A.* 5:12–84(c), –85(c) and –89(b)(2). The Commission ruled that if the Perlmans were not removed from positions of control in the extensive corporate hierarchy of which BRC and its corporate parents, Caesars New Jersey, Inc. (CNJ) and Caesars World, Inc. (CWI), were a part, BRC's application would be denied. The Commission further required BRC to choose, by November 26, 1980, either (1) to sever the Perlmans permanently from any ownership or employment connection with BRC, any of its parent companies, and any subsidiary of CWI in this or any other jurisdiction, or (2) withdraw as a casino licensee from New Jersey. BRC was also directed to submit a plan for Commission approval to implement whichever alternative it chose. Following the Appellate Division's denial of a stay of these conditions this Court granted a stay pending appeal.

On consolidated appeals of the Perlmans and the corporations the Appellate Division affirmed the Commission's decision as to the non-qualification of the Perlmans, but reversed to the extent that it required the Perlmans to divest their personal interests from non-New Jersey subsidiaries of CWI having no "gaming" activities. *In re Boardwalk Regency Casino License Application*, 180 *N.J.Super.* 324 (1981). It remanded to the Commission to recast its order consistent with the Appellate Division opinion and for "reasonable revision of the timetable." *Id.* at 350. The stay imposed by this Court remains in effect. *Ibid.*

The Perlmans and the corporations then filed notices of appeal to this Court, asserting "a substantial question arising under the Constitution of the United States", *R.* 2:2–1(a); and we granted the petitions for certification of the Attorney General and the Commission regarding the Appellate Division's modification of the Commission's order, 89 *N.J.* 405 (1982). In addition, the Attorney General filed a notice of cross-appeal directed to the same issue raised in his petition, namely, the

Appellate Division's invalidation of the Commission's requirement that the Perlmans disconnect themselves from all non-New Jersey non-gaming activities.

Specifically, the Commission required that as one of the conditions of BRC's casino licensure, the Perlmans must dispose of any interest whatsoever in subsidiaries of CWI that are situated outside of New Jersey and are not engaged in casino gaming activities; must be removed from any position as an officer, director or employee of such subsidiaries; and must not receive any remuneration in any form from such subsidiaries. It is this condition that the court below struck down. Today we reinstate that condition of licensure. With the exception of that single modification, we affirm the judgment of the Appellate Division substantially on the basis of Judge Fritz's comprehensive and perceptive opinion for that court.

I

While the Appellate Division's discussion of the facts, 180 *N.J.Super.* at 331–32, 335–36, suffices for our purposes today, several features nonetheless bear repeating. Initially, it is noteworthy that CWI, aptly described below as "[a] creature of humble beginnings," *id.* at 331, is today a multifaceted corporate giant, which, through its various nationwide subsidiaries, owns and operates businesses in both the gaming and non-gaming industries. Of particular import to this case, however, is CWI's relationship to BRC: BRC is a wholly owned subsidiary of CNJ in which CWI owns an 85% stock interest.

Moreover, since the Appellate Division decision, there have been several developments regarding the Perlmans' relationship with CWI and its subsidiaries. By way of background, when the matter first came before the Commission in September 1978, both Perlmans owned an extensive interest in CWI, CNJ, and thereby BRC. Clifford Perlman was Chairman of the Board of Directors and chief executive officer of CWI and CNJ, in addition to holding a 10% stock interest in CWI, and a 1.4%

interest in CNJ. Stuart Perlman was Vice-Chairman of the Board of Directors of CWI and CNJ. His stock ownership in CWI, about 8%, was second only to that of Clifford Perlman. He also held approximately a 1% interest in CNJ.

In contrast to the facts as they appeared when the case was before the Commission and the Appellate Division, the Perlmans' relationship to BRC through their extensive interest in CWI and CNJ has since changed. On October 30, 1981, CWI and the Perlmans entered into an agreement that provided that (1) the Perlmans would sell, and CWI would purchase, the Perlmans' shares of CWI and CNJ stock; (2) the Perlmans would acquire promissory notes for part of the purchase price of their CWI and CNJ stock; and (3) the Perlmans would resign from all of their positions as officers and directors of CWI and its subsidiaries, save for the fact that Clifford Perlman would enter into an agreement to continue as Chairman of the Board and chief executive of Desert Palace, Inc., a CWI subsidiary responsible for operating CWI's Nevada based casino-hotels.[1] On December 15, 1981, the Commission, upon application by CWI, approved of the arrangement except for Clifford Perlman's continued relationship with Desert Palace, Inc. A shareholder's suit challenging the arrangement was settled before we heard argument on the case.

As a threshold matter we must decide whether the agreements entered into between CWI and the Perlmans render this controversy moot, and whether the parties thereto have standing to raise the issues projected by this appeal. In our approach to these threshold questions, we are not limited to the "case or controversy" requirement imposed on the federal courts by way of Article III of the Federal Constitution, *U.S.Const.* art. III § 2. See *Crescent Park Tenants Ass'n v. Realty Equity*

---

[1]The agreement further provided that should the decisions below remain intact after this appeal, CWI has the option under the agreement to terminate Clifford Perlman from his positions with Desert Palace, Inc.

*Corp. of N. J.*, 58 *N.J.* 98, 107 (1971). Rather, in this jurisdiction a controversy is justiciable when "the litigants' concern with the subject matter evidence[s] a sufficient stake and real adverseness." *Id.* Moreover, where the parties lack a legally cognizable interest because the issues presented are technically moot, they may nonetheless obtain judicial review when the matter involves an area of particular concern to the public interest. *See, e.g., John F. Kennedy Memorial Hospital v. Heston,* 58 *N.J.* 576, 579 (1971); *Doe v. Bridgeton Hospital Ass'n, Inc.,* 71 *N.J.* 478, 482 n.1 (1976).

It is apparent that both Clifford and Stuart Perlman have standing and that the issues are not moot. As to Clifford Perlman, his interest in the outcome of this appeal assuredly remains live by the very terms of the agreement itself, which provides that if he is directed by this Court to divest his interest in CWI's gaming subsidiaries, his position at Desert Palace will be in jeopardy. See *supra* (At 367 n.1).

As to Stuart Perlman as well there remains a legally cognizable interest in the outcome of this appeal. Notwithstanding his agreement with CWI, there exists at least the possibility of his future involvement with CWI or one of its subsidiaries, given the extensive influence available to him within the CWI corporate structure. Moreover, we will not fetter a litigant with technical notions of justiciability when the only question as to whether his claim is amenable to judicial review arises from his compliance with a lower court or agency decision.

Finally, as to both Clifford and Stuart Perlman, it is beyond question that the final adjudication of the issues is a matter of considerable importance to the casino industry as well as the general public. Accordingly, the Perlmans' claims are ripe for judicial review.

## II

We turn to the merits of the case. Judge Fritz's exhaustive opinion below rejected a vigorous attack mounted by the

Perlmans and the corporations regarding the Commission's determination that neither Clifford nor Stuart Perlman had met the statutory requirement of demonstrating by clear and convincing evidence their good character, honesty and integrity. That attack has been renewed before this Court. The Appellate Division initially rejected the argument that the Commission failed to discuss adequately the relevant evidence in reaching its ultimate conclusions and that its conclusions were not based on sufficient credible evidence in the record. 180 *N.J.Super.* at 335–39. The Appellate Division also found "ingenious" but "unpersuasive" the contentions of the Perlmans and the corporations that the Act requires only a demonstration of the putative casino key employee's *reputation* for good character. *Id.* at 343. In this regard the court below found that the Act requires a demonstration of good character *in fact*, given the Legislature's explicit statements of public policy and of the "evils" it sought to address through the imposition of exacting and rigorous licensing procedures. *Id.* at 343–44.

The Appellate Division also considered a barrage of constitutional challenges to the statutory "good character" criterion. It rejected the contention that this criterion violated the Perlmans' due process rights, because it was unduly vague, stating that "the potential key employee is reasonably apprised by the statute, as a matter of common knowledge, in light of ordinary human experience, as to the kind of conduct necessary to satisfy the statute." *Id.* at 347. Similarly lacking in merit, in the court's view, was the contention that the good character criterion "allow[ed] the Commission to rely on guilt by association." *Id.* at 348.

We have reviewed the legal principles that underlie each of these arguments and the record developed below upon which the Commission based its findings. As to the arguments raised by the Perlmans and the corporations, set forth above, we repeat our endorsement of Judge Fritz's painstaking analysis and of the conclusions achieved in his opinion for the Appellate Division.

### IV

There remains one further area of discussion. As a final point of contention the Perlmans and the corporations maintain that the Commission's Order unconstitutionally conditions BRC's licensure on the Perlmans' divestiture of their interests in non-New Jersey subsidiaries of CWI. Their challenge in this regard is mounted on the basis of the Commerce Clause, *U.S.Const.* art. I, § 8, and the Due Process Clause, *U.S.Const.* amend. XIV.

■ As matters stand today, with this Court's stay in effect (see *supra* at 365), BRC is operating a New Jersey casino and Clifford Perlman is acting as chairman of the board of CWI's subsidiary Desert Palace, Inc., operator of CWI's Nevada gaming casino, Caesars Palace. Caesars Palace's position in the scheme of things is only partially illustrated by the fact that it is CWI's principal and most-profitable asset, having generated for the year ending April 30, 1980 about 43% of CWI's total gross revenues. In addition, it is the model after which CWI's hotel casino facilities, including BRC, are patterned, and it provides BRC with consultant services and management counselling. BRC and Caesars Palace share some directors in common. In his current position as Desert Palace's chairman Clifford Perlman has a direct relationship with Caesars Palace's management, and BRC has a direct relationship with the Nevada casino. The circumstances of Clifford Perlman's ability to influence BRC policy, too apparent to require further belabored explication, prompt our agreement with the Appellate Division's disposition of the Commerce Clause argument:

> The fallacy in this argument is that the order is said to purport "to regulate the management of substantial non-New Jersey operations * * * and to limit the Perlmans' business activities outside of New Jersey," when in fact it does no such thing. It neither regulates CWI nor any of its subsidiaries except BRC or the Perlmans, nor tells them what they must do. It only tells BRC, in terms completely in line with the statute and its purposes, the condition which must exist in view of its corporate connections, before it can enjoy the privilege of a casino license. No one will argue that New Jersey does not have a legitimate local public interest in determining who shall be thus licensed in New Jersey and under what conditions. We are satisfied this issue has no merit and warrants no further discussion. [180 *N.J.Super.* at 349.]

See *Pike v. Bruce Church, Inc.*, 397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.2d* 174, 178 (1970); *Exxon Corp. v. Governor of Maryland*, 437 *U.S.* 117, 124–127, 98 *S.Ct.* 2207, 2213–2215, 57 *L.Ed.2d* 91, 99–101 (1972).

▮ With the same dispatch, and on the same basis, can we address the Due Process argument, it being manifest that the Commission's divestiture order bears a rational relationship to a legitimate state interest. Insofar as the Due Process Clause is concerned, since no fundamental right is affected by the Commission's order, that ends the matter. See *Ballou v. State Department of Civil Service*, 75 *N.J.* 365, 370–71 (1978); *State v. Krol*, 68 *N.J.* 236, 248 (1975).

The Commission's order also required the disassociation of the Perlmans' personal interest in the non-New Jersey subsidiaries of CWI that had and have no connection with the gaming industry. As to this aspect of the Order, the Appellate Division was not convinced that traditional notions of due process had been satisfied. Essentially, the court seemed uncertain that requiring divestiture to this extent would serve any "legitimate state interest." 180 *N.J.Super.* at 349. We harbor no doubts on the issue, and we fail to see why, in the context of this case, any distinction should be made between gaming and non-gaming subsidiaries. The question remains, in either instance, whether the presence of either Perlman in the CWI corporate structure carries with it the opportunity for them to exert their personal influence in the operation of BRC. In the non-gaming as well as the gaming setting that question must be answered in the affirmative.

The record demonstrates that for many years the Perlmans have wielded enormous power and influence throughout CWI, which, it should be recalled, is simply a holding company with operating subsidiaries. Permitting the Perlmans to remain in or assume a structured, formal relationship of ownership, employment or management in one of those subsidiaries, albeit a non-gaming enterprise, would encourage—or at the very least

allow—the exertion of power and influence within the corporate structure. Indeed, the court below appears to have recognized this possibility by its reservation unto the Commission of the right to act should a "Perlman effect" become "manifest", citing *N.J.S.A.* 5:12–129. 180 *N.J.Super.* at 349.

■ What the Commission sought to do was prevent the Perlmans from influencing gaming policy, rather than react to that influence after it has been exerted. This is a reasonable aim, particularly inasmuch as the evidence demonstrated a substantial likelihood that the Perlmans would leave their mark on BRC policy were they to obtain or continue to occupy official positions within the corporate family. This perception of the Perlmans' presence within the corporate structure is borne out by the corporation's assertion that "the loss of the Perlmans' services has been, and continues to be, a substantial detriment" to CWI. Moreover, the corporations call attention to the "substantial and uncontradicted" evidence as to the importance of the Perlmans' functions in CWI and as to "the harm which has resulted to the company since the Perlmans have been isolated from its affairs." Given the degree of importance that the corporations themselves attach to Clifford and Stuart Perlman, we cannot say that the Commission's apprehension of their influence on CWI and BRC, even from a non-gaming subsidiary position, is ill-founded; nor can we conclude that there is insufficient evidence to support the conclusion that divestiture of the Perlmans' interests in CWI's non-gaming subsidiaries bears a rational relationship to the state's legitimate interest in preventing them from exercising corporate power and influence over BRC.

## V

Except as modified herein the judgment below is affirmed. All provisions of the Commission's order are reinstated, and the Commission is directed to establish a new timetable for submission of BRC's plans. The stay heretofore entered is vacated, effective ten days after release of this opinion.

PASHMAN, J., concurring in part and dissenting in part.

I concur with the majority opinion except insofar as it affirms the Casino Control Commission's order that the Perlmans separate themselves from non-New Jersey subsidiaries of Caesars World International (CWI). I would remand the case to the Commission for a factual finding on the Perlmans' ability to control Boardwalk Regency Corporation from positions in any other CWI subsidiaries.

The Casino Control Act provides that no corporation shall be eligible for a casino license unless its key employees or controlling persons are individually qualified for licenses. *N.J.S.A.* 5:12–85(c) provides in part:

> No corporation shall be eligible to hold a casino license unless each officer; each director; each person who directly or indirectly holds any beneficial interest or ownership of the securities issued by the corporation; any person who in the opinion of the commission has the ability to control the corporation ... or other person whom the commission may consider appropriate for approval or qualification would, but for residence, individually be qualified for approval as a casino key employee pursuant to the provisions of the act.

When Boardwalk Regency applied for a license, Clifford Perlman was chairman of the boards of directors of CWI and Caesars New Jersey (CNJ), the two parent corporations of Boardwalk Regency. Stuart Perlman was vice chairman of the boards of the two parent companies and a large stockholder in both. There was no question that they were key employees and controlling persons as defined in the statute.

However, it is no longer clear that the Perlmans fit within any of the categories of persons that must be individually qualified for Boardwalk Regency to retain its license under *N.J.S.A.* 5:12–85(c). They have sold all their stock in Caesars World and Caesars New Jersey and have resigned from their positions as officers in those corporations. Their sole remaining connection with the corporate family is Clifford Perlman's position as chairman of the board of directors and chief executive officer of the subsidiary of Caesars World that operates its Nevada hotel and casino.

Since the Perlmans are no longer directors, officers, employees or owners of any of the parent companies of Boardwalk Regency, the only remaining statutory category possibly applicable to them is that of a "person who in the opinion of the commission has the ability to control" Boardwalk Regency. *N.J.S.A.* 5:12–85(c). The Commission has never specifically determined whether the Perlmans would be able to control Boardwalk Regency solely from positions in other subsidiaries of Caesar's World. There is no evidence in the record on the Perlmans' ability to control the New Jersey licensee without control of and stock ownership in its parent corporations. Unless they are able to exercise such control, they need not be individually qualified for Boardwalk Regency to retain its license.

I am not convinced that the evidence cited by the majority, *ante* at 370–371, 372, is sufficient to conclude that the Perlmans can in fact control Boardwalk Regency from out-of-state CWI subsidiaries. The mere fact that the various corporations praise the Perlmans and want them back in the New Jersey licensee is not sufficient proof that the Perlmans can control the licensee solely from positions in other CWI subsidiaries. The evidence that the Nevada subsidiary offers counseling services to Boardwalk Regency is more to the point, but it is insufficiently developed in the record. Moreover, there is no evidence at all that the Perlmans can control Boardwalk Regency from non-gaming subsidiaries. As I see it, the factual situation has changed substantially since the Commission's determination. Any order we make should be based on the current situation.

I would remand the case to the Commission for a hearing on the Perlmans' continued ability to control the New Jersey licensee from positions in other CWI subsidiaries. This factual determination is a prerequisite to holding that either Perlman remains a controlling person within the meaning of *N.J.S.A.* 5:12–85(c). Without such a finding, there is no basis for requiring Clifford Perlman to withdraw from the Nevada subsidiary

as a prerequisite to licensing Boardwalk Regency. There is also no factual basis for ordering the Perlmans to refrain from any future connections with other CWI subsidiaries. Because the majority upholds the Commission order that the Perlmans separate themselves from all CWI subsidiaries without such a factual determination, I dissent.

*For affirmance and modification*—Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—5.

*Concurring and dissenting in part*—Justice PASHMAN—1.