IN THE MATTER OF RICHARD F. SIMEONE, AN ATTORNEY AT LAW.

Argued June 23, 1987—Decided October 9, 1987.

*William R. Wood,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Thomas A. DeClemente* argued the cause for respondent.

PER CURIAM.

This disciplinary matter arises from two separate reports and recommendations of the Disciplinary Review Board (DRB) that culminated in a recommendation of combined sanctions amounting to six years suspension, retroactive to the attorney's December 1980 suspension from practice.

The recommendation is based on the DRB's finding of multiple instances of misconduct involving neglect of certain clients' matters, misrepresentation of the status of other clients' matters, one instance of misuse of a client's funds as an attorney in a real estate matter, and one instance of misuse of a client's funds in the capacity of executor and a disregard of duty as executor to account when ordered to do so by the Superior Court. The DRB tempered its discipline because of extraordi-

nary circumstances that beset respondent during certain of the relevant periods. Specifically, the respondent bore the heavy burden of judicial duties imposed on him as municipal judge in a north Hudson County community beset by displaced persons, experienced severe illness in his family, and suffered the debilitating effects of alcoholism. In addition, the DRB found that the misuse of client funds was close in time to our decision in *In re Wilson*, 81 *N.J.* 451 (1979), warranting the exercise of leniency exhibited in *In re Smock*, 86 *N.J.* 426 (1981).

The DRB conditioned respondent's return to practice on (1) documentation of satisfactory proof that respondent had his alcohol-related disabilities under control; (2) submission of a plan for restitution of certain estate funds for which he was surcharged, and (3) completion thereafter of specified requirements of continued legal education.

Based on our independent review of the record, we are clearly convinced that respondent engaged in the described conduct and that the ethical infractions warrant the discipline recommended. We add an additional requirement that, on return, respondent practice under supervision in accordance with a plan to be approved by the DRB. The matters of gravest concern to us are the two instances of misuse of funds as attorney and executor. Yet, because, in our view, the proofs fall short of establishing a knowing misappropriation of funds, we accept the DRB's recommendation of discipline. We shall first discuss the other matters and return to the questions related to misuse of funds.

I.

The other ethical complaints against respondent involve various matters dating back to 1978. One matter involved misleading a client to believe that respondent had settled a garnishment case for $75 when in fact he had not; another, accepting a $500 retainer to handle an estate matter without taking any action on it; another, failure to pay title insurance premiums

and record the deed after a closing; and the last, a mishandling of a closing in which he collected insufficient funds from the sellers to pay required taxes and caused his clients to incur added expenses in closing for his failure to get the taxes paid. The DRB found these matters clearly to evidence that respondent acted deceitfully in violation of *DR* 1–102, exhibited gross neglect in violation of *DR* 6–101, and failed to carry out contracts of employment in violation of *DR* 7–101.[1]

## II.

The two critical matters that we shall consider involved the *Schleuter* estate and the *Homequity* matter. The former matter came to our attention while we were considering the discipline to impose for the first series of ethical infractions, including the *Homequity* matter. We suspended the respondent on December 23, 1980, because of the evidence of his misconduct that we had already received. However, in early 1983, we received the DRB's initial report concerning the *Schleuter* estate. In June 1983, we directed that final discipline on the *Homequity* matter be withheld pending resolution of complaints about respondent's mishandling of the *Schleuter* estate.

## A.

Respondent qualified as executor of the *Schleuter* estate in March 1981. He was then a suspended attorney and purported to act only as executor. The estate totalled approximately $315,000 and consisted primarily of savings bonds. The decedent's will divided the estate among numerous charitable beneficiaries with small portions going to respondent's children and his secretary's children. Failure to respond to the latter beneficiaries' requests for information led to a close examination of

---

[1] We refer here, as the DRB did, to the Disciplinary Rules of the Code of Professional Responsibility, which have been replaced by the Rules of Professional Conduct because the matters here occurred while the former were in effect.

respondent's handling of this estate. It was woefully inadequate. His decision immediately to cash in the bonds and pay a tax on the accumulated interest resulted in an apparent tax loss to the estate. Most significant to the Probate Part and to us is that respondent withdrew, without authorization, some $36,000 in commissions. The court had to cite respondent for contempt in order to obtain a satisfactory accounting. It found that respondent was entitled only to some $10,000 in commissions on income and principal, and it therefore surcharged respondent for over $25,000. In addition, it surcharged respondent for unauthorized accounting and legal fees incurred by the estate in correcting his mistakes, as well as for losses occasioned by the respondent's decision to cash in the bonds without knowing the tax consequences, and for certain over-distributions. In all, respondent stands surcharged for sums not less than $46,000. In addition, he was found guilty of contempt for failure to render his account when ordered by another judge of the Probate Part, and of failure to cooperate with the District Ethics Committee in his failure to produce records of estate assets.

In its oral findings the Probate Part concluded that respondent used the estate funds "with impunity" and that respondent's statements "defy explanation, logic, or rationality." It therefore removed him as executor. No charges of criminal conversion of the funds were made against respondent. The Attorney General was involved in the Probate matter on behalf of the charitable beneficiaries.

The District Ethics Committee and the DRB concluded that respondent had acted in gross neglect of his duties as an executor but had not converted estate funds knowingly since he honestly believed that he was entitled to the commissions taken. The presenter expressed it to the District Ethics Committee this way: "He took too much too soon." Although not acting as an attorney, respondent's conduct reflected on his fitness to practice law and demonstrated gross neglect and failure to carry out fiduciary responsibility. The DRB found the "conduct to be

extremely serious. Respondent's actions with regard to his duties as executor evidenced a total lack of knowledge and comprehension with regard to the proper handling of probate matters."

## B.

The final matter, the *Homequity* matter, involved the misuse of client funds in respondent's capacity as an attorney. Respondent undertook to represent Homequity in connection with a residential sale. Homequity had acquired the property for resale. The closing took place in December 1979, at which time respondent received $17,462 in closing proceeds for remittance to the seller, Homequity. Notwithstanding repeated requests, respondent did not turn over the proceeds until April 21, 1980. At that time, he had to put up $10,000 of his own funds and $7,362 in trust funds to make up the amount due. ($100 was to be retained for an attorney escrow.)

The critical question is whether the shortfall in respondent's accounts evidences a knowing misappropriation under *In re Wilson, supra,* 81 *N.J.* 451 which almost invariably calls for disbarment. The respondent denied any such intent. He testified:

RESPONDENT: I do not deny the fact that the moneys were taken out. They were taken out by me but at that time I thought that they were mine. I intended in no way to borrow or deceive or steal or anything like that from any clients. It was then when I realized because very often I used to have—sometimes my trust account when my practice was much more lucrative, I would have lots of moneys in there and I would just take out, from time-to-time, write myself a check on such-and-such a matter or the fee on account or something like that, not for tax purposes or income tax purposes. Some attorney told me that you should do that or take your fee out later. If you settle a negligence case in November, try and take it out in January, or something like that. I can write a book on what I—I just wouldn't take it all out at once.

THE PRESENTER: You felt that this eight of $10,000 was fees that had been in your trust account and that was due to you?

RESPONDENT: Right. On this other matter, there were other matters I had been handling over the year and so forth. That is when I realized that it was short and I said, oh my goodness, you know, it was terrible.

There is no question that the entrusted funds did not remain intact. But there is some question whether respondent knowingly misused the funds. The DRB concluded that respondent "knew or should have known that he was improperly removing client funds from his trust account." Of course, poor accounting should not, and does not, establish a *Wilson* defense, *In re Fleischer*, 102 *N.J.* 440, 447 (1986); but poor accounting is not a *Wilson* violation absent evidence of a knowing misappropriation.

We have recently had occasion to restate the guiding principles that we follow:

> We see the case, then, as involving more—much more—than the simple "shoddy bookkeeping" that called for a public reprimand in *In re Hennessy*, 93 *N.J.* 358 (1983), in which no one charged respondent, whose practice involved "relatively few legal matters at any one time" *id.* at 360, with any misappropriation. *Ibid.* Although we can recall no other ethics case with quite the twists of this one, perhaps *In re Orlando*, 104 *N.J.* 344 (1986), serves to illustrate the principle we invoke today. The record in *Orlando* reflected that "respondent was seriously and inexcusably inattentive to the accounting and bookkeeping details of his voluminous real estate practice," *id.* at 350, but because the proofs did not add up to a knowing misappropriation, the discipline we imposed was the four-and-one-half years that Orlando had served by way of voluntary temporary suspension.
>
> A word of caution is in order. First, we repeat the admonition found in *Orlando* that
>
>> [d]isbarment is mandated for the knowing misappropriation of clients' funds, *In re Wilson, supra*, 81 *N.J.* 451, for combining operating and trust funds in order to pay personal and office expenses, *In re Fleischer*, 102 *N.J.* 440 (1986), and for borrowing from one client's account to make up for a shortfall in another's, *In re Arnold E. Brown*, 102 *N.J.* 512 (1986). [93 *N.J.* at 360.]
>
> *See also In re Skevin*, 104 *N.J.* 476, 487 (1986) (respondent knew of deficit condition of trust account, knew that it had been produced and was being continued by writing checks against trust accounts that should have remained untouched until used for purposes for which those funds had been entrusted to him; discipline imposed: disbarment).
>
> Second, we do not intend to suggest that henceforth a respondent who just walks away from his fiduciary obligation as safekeeper of client funds can expect this Court to take an indulgent view of any misappropriation. We will view "defensive ignorance" with a jaundiced eye. The intentional and purposeful avoidance of knowing what is going on in one's trust account will not be deemed a shield against proof of what would otherwise be a "knowing misappropriation." There may be semantical inconsistencies, but we are confident

that within our ethics system, there is sufficient sophistication to detect the difference between intentional ignorance and legitimate lack of knowledge.

Finally, we retreat not one bit from the principle that "[i]t is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using clients' trust funds." *In re Fleischer*, 102 *N.J.* 440, 447 (1986). Here, however, we are impressed with the absence of clear and convincing proof that respondent in fact "designed" such a system.

[*In re Johnson*, 105 *N.J.* 249, 259–60 (1987).]

To this we would add only the observation, made in *In re Warhaftig*, 106 *N.J.* 529, 533–34 (1987), that:

It is clear that respondent's conduct constituted knowing misappropriation as contemplated by *Wilson*. Through the use of the advance-fee mechanism, he took funds from his trust account before he had any legal right to those monies. These "fees" were taken by respondent before he received any deposits in connection with the relevant real-estate closings. Thus, he was effectively borrowing monies from one group of clients in order to compensate himself, in advance, for matters being handled for other clients. Respondent made these withdrawals with full recognition that his actions had not been authorized by his clients, and that he was therefore violating the rules governing attorney conduct. Respondent's unauthorized misappropriation of clients' trust funds for his personal needs cannot be distinguished from the conduct condemned in *Wilson, supra.*

In this case there is no such clear and convincing evidence that respondent was systematically taking advance fees or otherwise borrowing from clients' funds. Were there such proof, we would have to resolve whether the proximity of the misconduct to the date of *Wilson* would warrant withholding its deterrent sanction. *Wilson* was decided on December 19, 1979, and published in the *New Jersey Law Journal* on January 17, 1980, and in the *Atlantic* 2d advance sheets on February 22, 1980. As noted from respondent's own statement, he depleted the balance in the trust account over a period of time after the December 1979 closing and until he discovered the shortage in April 1980. However, as noted, we find that respondent's conduct falls short of establishing the knowing misappropriation that the *Wilson* sanction seeks to deter.

Nonetheless, we do agree with the DRB that, taken in its entirety, the conduct is extremely serious and warrants the most severe discipline short of disbarment. The purpose of attorney discipline is protection of the public. Like the respon-

dents in *In re Pauk,* 107 *N.J.* 295 (1987), *In re Johnson, supra,* 105 *N.J.* 249, *In re Noonan,* 102 *N.J.* 157 (1986), *In re O'Gorman,* 99 *N.J.* 482 (1985), and *In re Templeton,* 99 *N.J.* 365 (1985), respondent's infractions are serious and numerous; nonetheless in this case, as in those, we do not find that the record supports a conclusion that respondent's conduct warrants disbarment. Hence, we agree with the DRB's recommendation that respondent's temporary suspension from the practice of law on December 23, 1980, over six years ago, subject to the additional conditions precedent to the respondent's resumption of practice imposed by the DRB, is sufficient discipline for the misconduct committed here. However, respondent's misconduct demonstrates that he is not sufficiently responsible at this time to practice law as a single practitioner. Consequently, as noted, we have concluded that the respondent's right to resume practice shall not be restored except under conditions assuring that he will be subject to the supervision of another attorney, with the conditions surrounding that supervision and the supervising attorney to be satisfactory to the Office of Attorney Ethics and approved by the DRB.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the production of transcripts.

So ordered.

*For suspension* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7 join in this opinion.

*Opposed*—None.

## ORDER

This matter having been presented to the Court on the recommendation of the Disciplinary Review Board that the discipline to be imposed upon RICHARD F. SIMEONE, of UNION CITY, who was admitted to the bar of New Jersey in

1958, be limited to the time he has served since his temporary suspension from the practice of law on December 23, 1980, and that specified conditions attach to his restoration to the practice of law, and good cause appearing;

It is ORDERED that the suspension of RICHARD F. SI-MEONE from the practice of law shall continue until the further order of the Court; and it is further

ORDERED that RICHARD F. SIMEONE is eligible to apply for his restoration to the practice of law under *R.* 1:20–11(h); and it is further

ORDERED that RICHARD F. SIMEONE's restoration to the practice of law is conditioned on his submission of medical and psychiatric proofs demonstrating that his alcoholism is under control and that he is capable of returning to the practice of law and a plan for restitution to the Schleuter estate that meets with the approval of the Disciplinary Review Board; and it is further

ORDERED that until the further order of the Court, the restoration of RICHARD F. SIMEONE, shall be subject to the further conditions that his practice be supervised by a preceptor to be approved pursuant to Administrative Guideline No. 28 and that during his first year of his return to practice, he enroll in and attend six courses in basic legal education offered by the Institute for Continuing Legal Education; and it is further

ORDERED that respondent shall continue to be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for the appropriate administrative costs arising out of the prosecution of this disciplinary matter, including the production of transcripts; and it is further

ORDERED that respondent continue to comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended attorneys.