IN THE MATTER OF CHARLES H. JAMES, AN ATTORNEY AT LAW.

Argued January 4, 1988—Decided October 14, 1988.

*Robyn M. Hill,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Joseph J. Rodgers,* argued the cause for respondent (*Fineberg & Rodgers,* attorneys).

PER CURIAM.

This disciplinary proceeding arose out of a 1984 audit of respondent's accounts pursuant to the Random Audit Program. Respondent is charged with nine counts of ethical violations, including failure to maintain required records, failure to safeguard client funds, failure to pay promptly funds to a client, gross negligence in accounting for client funds, and misappropriation.

The District XIV Ethics Committee (the Ethics Committee) returned a presentment, charging that respondent misunderstood the purpose of a lawyer's trust account, used his trust account as a second business account, used clients' trust account funds to advance costs to other clients, and used clients' funds to pay litigation expenses and payroll taxes, resulting in his trust accounts being "out of trust."

The Ethics Committee also found that respondent failed to disburse money in a timely fashion, and that he misused clients' funds, but found that respondent's misuse of clients' funds did not result in a knowing misappropriation, that no clients were injured as a result of his conduct, that he freely acknowledged his violations, and took remedial measures to prevent a recurrence. In the eyes of the Ethics Committee, although respondent failed to safeguard his clients' funds, his conduct did not constitute a knowing misappropriation. Consequently, the Ethics Committee concluded that "were it not for the fact that this is a trust account matter, which is governed by specific cases,

we would recommend private discipline. However, since this is a trust account matter, we feel we must recommend public discipline."

The Disciplinary Review Board (DRB) concluded that the evidence clearly and convincingly supported the finding that the respondent was "guilty of unethical conduct for his serious record keeping derelictions." Although the DRB unanimously recommended that public discipline was warranted, it was divided on the appropriate measure of discipline, the majority concluding that a public reprimand was sufficient, while the minority recommended an imposition of a one-year suspension. Our independent review of the record leads us to conclude that a suspension is required.

I

As found by the DRB, the facts are:

Respondent was randomly selected for a compliance audit of his trust account pursuant to *R.* 1:21–6(c). Auditors of the Random Audit Program visited respondent's office on September 19 and November 28, 1984. The audit disclosed the following deficiencies and irregularities:

1. THE HALL MATTER

Respondent held $6,502.04 in his trust account on behalf of Mrs. Florentine Hall from March 25, 1980 through September 24, 1984. These funds were ultimately disbursed to Mrs. Hall via a trust account check which was honored on October 2, 1984. The amount of $6,502.04 should have remained in respondent's trust account for the entire period of time between deposit and disbursement. However, on at least 28 occasions between February 22, 1982 and September 12, 1984, the balance on deposit in respondent's account was less than $6,502.04. On one such occasion, February 15, 1983, the balance on deposit in the account was $833.90, meaning that respondent was at least $5,668.14 out-of-trust.

2. THE JONES MATTER

Respondent held $2,410.56 in his trust account on behalf of members of the Jones family from August 30, 1982 through October 9, 1984. These funds should have remained in respondent's trust account for the entire period of time between deposit and disbursement. However, on no less than 20 different occasions between those dates, the balance on deposit in the trust account was less than $2,410.56. On one such occasion, February 15, 1983, the balance on

deposit in the account was $833.90, meaning that respondent was $1,576.66 out-of-trust as to these clients alone.

## 3. THE GANNON AND MATUSIAK MATTER

Respondent represented William F. Gannon and Joseph Matusiak in connection with their acquisition of commercial property in the City of North Wildwood. After making the initial purchase of the tax certificate as a "strawman" with funds provided by his clients, respondent continued to satisfy additional obligations on their behalf utilizing funds on deposit in his trust account without first obtaining additional moneys from them. From November 6, 1981 through September 17, 1984 respondent's ledger cards for Messrs. Gannon and Matusiak reflected a continuous negative balance ranging from a high of ($5,075.80) on November 5, 1982 to a low of ($1,419.44) on September 17, 1984. Disbursement on behalf of these clients was, therefore, made from other funds in the trust account.

## 4. THE FORD MATTER

Respondent represented Helen Ford in connection with a personal injury matter. On February 15, 1983, respondent received a check from the insurance company in the amount of $5,100 representing settlement process. He immediately took his fee of $2,000 by issuing a trust account check to his own order. Nine days later, on February 24, 1983, the settlement check was deposited into his own trust account. The $2,000 fee was therefore drawn against other funds in his trust account.

## 5. STATE and FEDERAL TAX PAYMENTS

Respondent's payroll ledger card, entitled "CHJ Payroll," consistently contained negative balances from at least April 1982 through September 1984 as respondent disbursed funds for payment of taxes in excess of funds deposited in the trust account for that purpose. Examination of respondent's records disclosed that $2,988.96 in payments out of respondent's trust account represented penalties and interest imposed for failure to make required payments in a timely manner. Additional payments totaling $5,546.37 represented respondent's personal share of his employees' Social Security obligations from 1982 through 1984. As a result of these payments, on one occasion, August 23, 1984, the "CHJ Payroll" ledger card reflected a negative balance of $7,013.98.

## 6. FAILURE TO MAINTAIN REQUIRED RECORDS

Examination of respondent's books and records disclosed that respondent failed to maintain a separate ledger page for each trust client, failed to maintain receipt and disbursement journals, and failed to reconcile trust account bank statements with the trust account ledger.

Upon receiving notification of the random audit, respondent conducted his own review of the trust account. On September 18, 1984, one day before the

audit was conducted, respondent deposited two business account checks totaling $10,781.46 into his trust account. Simultaneously, respondent withdrew $5,858.41 from his trust account which he had identified as earned fees by a trust check payable to himself. Immediately preceding these deposits and withdrawal, the trust account ledger, as reconciled by the audit, reflected a net shortage of $5,675.18.

The ethics committee conducted hearings on January 17, January 30 and February 5, 1986. The committee had an opportunity to review a substantial amount of documentary evidence, the affidavits of Dennis Jones, Georgette Jones, and Florentine Hall, the aforementioned clients of respondent who therein expressed their continued confidence in his abilities and integrity, and heard the testimony of numerous individuals including five character witnesses. Respondent testified on his own behalf. He acknowledged that the ultimate responsibility for the deficiencies and irregularities was his. He stated, however, that he had been following the same business practices and accounting procedures, which he had learned from his legal mentors, for the past 24 years without incident. Thus, he had no idea that any such problems could or would arise.

Respondent explained that he had in essence been using his attorney trust account as a second business account for client expenses and employee payroll tax escrow funds. As a general rule, respondent handed all bills to his secretary/bookkeeper who would in turn prepare a check and present the same to respondent for signature. Whenever the balance in the trust account approached a level where outstanding client obligations could not be satisfied, funds were transferred from the business account to the trust account. Respondent's secretary rarely kept him advised of the status of the books and he never thought to inquire. Since no check had ever been returned for insufficient funds, respondent assumed that there were sufficient funds in the account to cover checks written at any given time. Respondent admitted that he "really didn't worry about it because I knew that I had funds of my own if there ever was a problem to cover those things, and that's precisely when I did find out what occurred, what I did."

Respondent further testified that generally a substantial residuum of earned fees remained in his trust account. Respondent stated that he was totally unaware that he was using the funds of some clients to benefit other clients or satisfy his employees' social security and tax obligations. He stressed the point that he never used any of these funds for personal or business expenses and had absolutely no intention of misappropriating clients' funds for his own or anyone else's benefit. While he readily admitted he had failed to safeguard his clients' funds, he vehemently denied that he had ever knowingly misappropriated same.

## Based on these findings, the DRB concluded:

Upon independent *de novo* review of the full record, the Board is satisfied that the conclusions of the ethics committee that respondent is guilty of unethical conduct for his serious record keeping derelictions are supported by clear and convincing evidence. The Board concurs with the committee's analy-

sis of the Disciplinary Rules and Rules of Professional Conduct which were violated.

The Board is unanimous in its conclusion that public discipline is warranted. There is a division, however, as to the quantum of discipline deemed appropriate in this matter, which is discussed more fully in the separate conclusion of the majority and minority.

As did the committee below, the Board also carefully reviewed the record in order to determine independently whether respondent had knowingly misappropriated any client funds. The Board unanimously finds no evidence that respondent committed a knowing misappropriation.

The requisite standard of proof was described in *In re Pennica*, 36 *N.J.* 401 (1962), as follows:

Because of the dire consequences which may flow from an adverse finding, however, we regard as necessary to sustain such a finding the production of a greater *quantum* of proof than is ordinarily required in a civil action, *i.e.*, a preponderance of the evidence, but less than that called for to sustain a criminal conviction, *i.e.*, proof of guilt beyond a reasonable doubt. Although the specific rule has not been articulated previously in this State, we declare it to be that discipline or disbarment is warranted only where the evidence of unethical conduct or unfitness to continue in practice against an attorney is clear and convincing. [Citations omitted]. [*Id.* at 419].

*Accord In re Gross*, 67 *N.J.* 419, 424 (1975); *In re Rockoff*, 66 *N.J.* 394, 396–397 (1975).

In another context, the clear and convincing standard was described in *State v. Hodge*, 95 *N.J.* 369 (1984), as

that which "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established," evidence "so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." [*In re Boardwalk Regency Casino License Application*, 180 *N.J.Super*, 324, 339 (App.Div.1981), mod., 90 *N.J.* 361 (1982) (quoting *Aiello v. Knoll Golf Club*, 64 *N.J.Super.* 156, 162 (App.Div.1960).] [*Id.* at 376.

The Board has applied these standards in determining whether the record before it demonstrates clearly and convincingly that respondent misappropriated client funds and, if so, whether his dereliction was a knowing one, warranting the most extreme disciplinary sanction.

Misappropriation is "any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson*, 81 *N.J.* 451, 455 n. 1 (1979). The misappropriation that will trigger automatic and almost invariable disbarment "consists simply of a lawyer taking a client's money and knowing that the client has not authorized the taking." *Matter of Noonan*, 102 *N.J.* 157, 159–60 (1986).

The Court in *Noonan* further observed:

It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorneys state of mind, is irrelevant: it is the mere act of taking your client's money *knowing that you have no authority to do so* that requires disbarment. To the extent that the language of the DRB or the District Ethics Committee suggests that some kind of intent to defraud or something else is required, that is not so. To the extent that it suggests that these varied circumstances might be sufficiently mitigating to warrant a sanction less than disbarment where *knowing misappropriation is involved*, that is not so either. The presence of 'good character and fitness,' the absence of 'dishonesty, venality, or immorality'—are all irrelevant. While this court indicated that disbarment for *knowing misappropriation* shall be 'almost invariable,' the fact is that since *Wilson*, it has been invariable. [*Id.* at 160] [footnote omitted; emphasis supplied].

*Accord Matter of Warhaftig*, 106 *N.J.* 529, 533 (1987).

The focus of all of these cases as well as plethora of other disciplinary opinions is that for disbarment to be warranted a finding is necessary that the misappropriation was *knowingly* made. In determining whether a knowing misappropriation has occurred, the Board is mindful that "[i]t is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using clients' trust funds. Lawyers have a duty to assure that their accounting practices are sufficient to prevent misappropriation of trust funds." *Matter of Fleischer, et al.*, 102 *N.J.* 440, 447 (1986). "... poor accounting should not, and does not, establish a *Wilson* defense, ... but poor accounting is not a *Wilson* violation absent evidence of a knowing misappropriation." *Matter of Simeone*, 108 *N.J.* 515, 521 (1987) [citation omitted]. Additionally, inattentiveness, laziness, or lack of due diligence should not be regarded as conduct sufficiently gross as to warrant disbarment. *Matter of Noonan, supra*, 102 *N.J.* at 161.

Based on this record, the Board is unable to conclude that the evidence before it is of a character so clear, direct, weighty, and convincing to enable it, without hesitancy, to conclude that a knowing misappropriation has occurred. *See State v. Hodge, supra*, 95 *N.J.* at 376.

In *Matter of Fleischer, et al., supra*, 102 *N.J.* 440, the respondents admitted to a conscious joint decision to stop using their operating account and use only their trust account to pay all disbursements, including operating expenses. One of the respondents admitted that a bounced trust account check demonstrated his awareness that the firm lacked sufficient trust account funds. The Court there observed that "[n]o member of the public could possibly have confidence in a disciplinary system that was blind to admitted misappropriations." *Id.* at 448.

Here respondent was seriously and inexcusably inattentive to the accounting and bookkeeping details of his practice. *See Matter of Orlando,* 104 *N.J.* 344 (1986). The record demonstrates a situation in which respondent exhibited an unhealthy ignorance of what was happening in his own practice. *Matter of Johnson,* 105 *N.J.* 249, 258 (1987).

The facts of this case establish that respondent did not deliberately design an accounting system that would enable him to misappropriate his clients' funds. Respondent "inherited" this accounting system from his former senior partners and relied upon it for 24 years. He did not deliberately create the fertile environment which fostered the growth of these problems. Nor did he suddenly merge his business and trust accounts or commingle both funds in order to meet his personal and professional obligations. *See Matter of Fleischer, et al., supra,* 102 *N.J.* 440. With the exception of his employees' payroll tax and Social Security obligations, the trust account was used exclusively for expenses and disbursements relating to client cases. All other expenses were paid out of his business account.

Inexcusably, respondent totally abdicated responsibility for the accounting and bookkeeping in his office by relegating those functions to his secretary. His secretary rarely kept him advised of the status of the books and he was disinclined to inquire or conduct a personal review of them. Respondent's accounting system, which had been in place for 24 years without incident, in all likelihood would have continued indefinitely had it not been interrupted by the Random Audit Program.

Impressed with the absence of clear and convincing proof that respondent knowingly misappropriated or intentionally designed a system preventing him from knowing whether he was using client funds, the Board concludes that the sanction mandated by *Wilson* and its progeny is inappropriate.

On the other hand, clear and convincing evidence has been demonstrated that respondent's conduct, despite his lack of knowledge, was unethical. The record amply reflects that respondent was seriously inattentive to the accounting and bookkeeping details of his practice. On several occasions, he was advised by his secretary that the balance of the trust account had reached the level where outstanding client obligations could not be satisfied. Yet, rather than review his books and discover the reason for the deficiency, respondent simply transferred funds from his business account to the trust account. Additionally, he unhesitatingly satisfied numerous financial obligations on behalf of Gannon and Matusiak without first asking his secretary whether sufficient funds to cover same had been received from them or deposited on their behalf. Finally, in the Ford matter, respondent took his fee of $2,000 by issuing a trust account check to his own order. Assuming he believed his secretary promptly deposited the check, he should have waited until it cleared.

On this record, there is no rationale, short of the disturbing fact that this is the way respondent has always conducted business, to explain respondent's actions. Respondent's personal solvency was never at issue, nor was the success of his law practice. No personal motivations taint this record. Plainly and simply, respondent did not know how to manage his attorney accounts appropriately because no one had ever shown him. The record clearly discloses

an utter lack of comprehension of what constitutes the proper operation of an attorney's accounts. *See Matter of Hennessy,* 93 *N.J.* 358, 360 (1983).

The question then presents itself what quantum of discipline is justified by respondent's misconduct. In judging this question, the Board has carefully considered the observation of our Supreme Court in *Matter of Johnson, supra,* 105 *N.J.* at 260 where the Court expressed confidence "... that within our ethics system, there is sufficient sophistication to detect the difference between intentional ignorance and legitimate lack of knowledge." In the instant matter, the Board is satisfied that respondent's conduct occurred as the result of a lack of knowledge and not from intentional ignorance.

"Discipline is generally regarded as non-punitive in its essence. The primary purpose is to protect the public against members of the bar who are unworthy of the trust and confidence essential to the relationship of attorney and client." *In re Introcaso,* 26 *N.J.* 353, 360 (1958). In recommending discipline, the interests of the public, the bar and the respondent must all be considered. *Matter of Kushner,* 101 *N.J.* 397, 400 (1986). "The severity of discipline to be imposed must comport with the seriousness of the ethical infractions...." *In re Nighosian,* 88 *N.J.* 308, 315 (1982). "Contrition and admission of wrongdoing are mitigating factors in respondent's favor." *In re Rosenthal,* 90 *N.J.* 12, 17 (1982); *In re Horan,* 78 *N.J.* 244, 247 (1978).

Although in cases of knowing misappropriation evidence of an attorney's good reputation and prior trustworthiness is of little moment, here, evidence of general good character must be considered. Thus, the Board has considered the respondent's 28 years as a member of the bar. This is the first disciplinary complaint ever filed against him. He has admitted his wrongdoing and has taken steps to bring his accounting records in compliance with the rules.

The record also demonstrates that respondent has been extremely active in his community, both politically and professionally, and enjoys a good reputation among his peers. His trustworthiness and professionalism have never before been challenged. *Matter of Orlando, supra,* 104 *N.J.* at 351. These factors weigh heavily in respondent's favor.

It has frequently been stated that a principle reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general. *In re Wilson, supra,* 81 *N.J.* at 456; *Matter of Orlando, supra,* 104 *N.J.* at 349. In this regard, the Board is particularly impressed with the testimony received from several clients whose specific funds were alleged to have been misused. These clients submitted affidavits indicating that they were completely satisfied with respondent's representation of their interests and expressing their continued and undiminished confidence in his ability and integrity.

Beyond these considerations, the record does not support a conclusion that respondent's conduct was based on dishonesty, venality, corruption or immorality. *Matter of Templeton,* 99 *N.J.* 365, 376 (1985). Respondent's conduct comes nowhere near the flagrant bookkeeping abuses found in the *Orlando, Noonan,* and *Johnson* cases, where gross negligence caused monetary losses to be inflicted upon numerous clients. However, respondent's total abdication of his

record keeping responsibilities, with resultant substantial shortages (and potential financial exposure of his clients) may not be ignored.

The ultimate question is what sanction should be imposed upon respondent for his serious record keeping derelictions. Having concluded that respondent did not knowingly misappropriate clients' funds, the sanction of disbarment is clearly not warranted. The imposition of a private reprimand is equally unjustified because of the seriousness of respondent's misconduct. In this matter, respondent's conduct cannot and should not go unnoticed. Every attorney has an affirmative obligation to maintain trust funds in accordance with the strictures of the disciplinary rules. The district ethics committee's conclusion that public discipline was mandated is wholly supported by our review of the facts.

That leaves a choice between the imposition of a term of suspension and the imposition of a stern public reprimand. In making this choice, the Board is mindful of the commentary appended in section 4.13 of the *Standards for Imposing Lawyer's Sanctions*, adopted by the Joint Committee on Professional Sanctions of the American Bar Association and approved in February 1986 by the ABA House of Delegates. That commentary reads in relevant part:

> Reprimand should be reserved for lawyers who are merely negligent in dealing with client property, and who cause injury or potential injury to a client. Suspension or disbarment ... is appropriate for lawyers who are grossly negligent. For example, lawyers who are grossly negligent in failing to establish proper accounting procedures should be suspended; reprimand is appropriate for lawyers who fail to follow their established procedures. Reprimand is also appropriate when a lawyer is negligent in training or supervising his or her office staff concerning proper procedures in handling client funds.

Notwithstanding this commentary, the majority of the Board concludes that only a public reprimand is warranted. Discipline is not intended to be punitive. It is intended to be instructive in the public interest. In this regard, it should be noted that during his appearance before the Board, respondent, through counsel, volunteered to speak throughout the State on the topic of maintaining appropriate trust account records. The Board does not make that a condition of the sanction now being recommended. In a sense, however, through the opinion that the Supreme Court will undoubtedly prepare in this matter, respondent will "travel" throughout the State, clearly advising members of the bar of their responsibility to keep their trust accounts in proper order. In this regard, the opinion will be instructive in the public interest.

Would the imposition of a term of suspension upon this respondent serve a useful purpose? The majority thinks not. Instead, it would only disrupt an otherwise unblemished career and create hardship not only for respondent, but also for his clients, who by their testimony continue to have confidence in him as their attorney.

While the Board majority is disinclined to follow the heed of the commentary to the ABA standard in this matter, the Board respectfully recommends the prospective adoption of the standard to all conduct following the issuance of appropriate notice to the bar. * * *.

Accordingly, the Board recommended the prospective adoption of a rule requiring suspension of attorneys who fail to establish proper accounting procedures.

Writing for herself and two other members of the Board, Elizabeth Buff dissented "from the majority's conclusion that a term of suspension is inappropriate." Mrs. Buff, who recommended a one-year suspension, concluded:

> There is no question in our minds that this case involves much more than the "shoddy bookkeeping" that called for a public reprimand in *In re Hennessey*, 93 *N.J.* 358 (1983). Respondent's unhesitating satisfaction of numerous financial obligations on behalf of Gannon and Matusiak alone convinces us that his unethical conduct far transcends "shoddy bookkeeping." The continuous disbursement of trust account moneys on behalf of these two preferred clients without knowing whether funds sufficient to cover same had been received from or deposited on behalf of these clients, combined with the consequential use of other clients' funds, is more illustrative of gross negligence than indicative of a simple failure to follow accepted accounting practices.

> This is not to say that respondent committed "defensive ignorance" by intentionally and purposefully avoiding knowledge of what was going on in his trust account. *See Matter of Johnson*, 105 *N.J.* 249, 260 (1987). Respondent's lack of knowledge regarding the state of his trust account was due more to a complete and utter lack of concern or interest, which, when coupled with misplaced reliance on and faith in an antiquated accounting system, constituted nothing less than gross negligence.

> In this regard, we wholeheartedly agree with the majority that the *Standards For Imposing Lawyer Sanctions of the American Bar Association*, approved February 1986, provide a great deal of guidance. * * *.

> Unlike the majority, we are inclined to heed the guidelines set forth in the commentary to section 4.13. In so doing we find that respondent did not simply fail to follow established accounting procedures or train and supervise his staff. Rather, respondent failed to establish such procedures and compounded his transgression with his ignorance of and his ineptitude in understanding the procedures he "inherited."

> Respondent's lack of proper accounting procedures and overall ineptitude in bookkeeping is most graphically demonstrated by his last minute effort to play "24 year catch-up" during the days immediately preceding the random audit. As a result of his own calculations, respondent deposited $10,781.46 into his trust account and concurrently withdrew $5,848.41 in fees. The trust account balance on the first day of the audit was thereby increased by $4,933.05, an amount respondent determined was necessary to balance the account. After

professional auditors had fine-combed his records for over a year,[1] the trust deficiency was found to be $5,675.18, a disparity of $742.13. Consequently, even when respondent finally addressed his trust account responsibility he could not get it right.

We are mindful that the purpose of discipline is not to punish the offender but to protect the public from the attorney who does not meet the standards of responsibility of his profession. *In re Goldstaub*, 90 *N.J.* 1, 5 (1982); *In re Hughes*, 90 *N.J.* 32, 36 (1982); *In re Stout*, 75 *N.J.* 321, 325 (1978). Here, the record does not support a conclusion that respondent's misconduct was based on dishonesty, venality or immorality. His misconduct, although constituting gross negligence, does not lead to a conclusion that his "good character and fitness have been permanently and irretrievably lost," *Matter of Templeton*, 99 *N.J.* 365, 376–377 (1985), so as to warrant disbarment. It does, however, lead to a conclusion that a serious sanction consisting of a term of suspension be imposed.

Our independent review leads us to find, as did the Ethics Committee and all members of the DRB, that the record does not clearly and convincingly establish that respondent knowingly misappropriated client funds or that he intentionally designed or perpetuated a system preventing him from knowing whether he was using client funds. Instead, respondent in good faith perpetuated an inadequate system that led to negative balances in his trust account. In short, his misuse of trust funds was the product not of a knowing misappropriation, but of gross negligence. Lawyers remain obligated "to assure that their accounting practices are sufficient to prevent misappropriation of trust funds." *In re Fleischer*, 102 *N.J.* 440, 447 (1986).

We cannot ignore the length of time spanned by respondent's misconduct or the degree of his negligence. Hence, we are persuaded that a period of suspension is required. Given the absence of injury to his clients, their continuing confidence in him, his otherwise unblemished record, excellent reputation, and good character, we conclude that the public interest in maintaining confidence in the bar is satisfied by a suspension for three months.

---

[1]The audit commenced on September 19, 1984; the audit report was filed on October 17, 1985.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

*For suspension* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.

## ORDER

It is ORDERED that CHARLES H. JAMES of WILDWOOD, who was admitted to the bar of this State in 1959, be suspended from the practice of law for a period of three months, effective November 1, 1988, and until the further order of this Court; and it is further

ORDERED that CHARLES H. JAMES reimburse the Ethics Financial Committee for appropriate administrative costs, including the production of transcripts; and it is further

ORDERED that CHARLES H. JAMES be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that CHARLES H. JAMES comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended attorneys.