IN THE MATTER OF STEPHEN GOLD, AN
ATTORNEY AT LAW.

Argued October 11, 1988—Decided May 26, 1989.

*Robyn M. Hill,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Thomas J. Beetel* argued the cause for respondent.

PER CURIAM.

The Disciplinary Review Board (DRB), with four members dissenting, stated that it was unable to conclude that respondent had committed a knowing misappropriation. We agree to the extent that the evidence was insufficient to establish that respondent knowingly misappropriated trust funds after December 19, 1979, the date of publication of *In re Wilson,* 81 *N.J.* 451. Although we find that respondent committed unethical conduct meriting public discipline, we agree with the DRB that respondent's suspension since 1984 is sufficient discipline.

The underlying facts are accurately summarized in the DRB decision and recommendation:

This matter is before the Board based upon a Report submitted by James E. Quinn, J.S.C., Ret., Special Master sitting for the District XIII Ethics Committee.

On February 10, 1982, the Hunterdon County Grand Jury handed down Indictment No. 30–J–81 charging respondent with embezzlement in violation of *N.J.S.A.* 2A:102–2 and misapplication of entrusted property in violation of *N.J.S.A.* 2:21–15. His first trial resulted in a hung jury and a mistrial was

declared. A second trial was commenced but again resulted in a mistrial when the method of jury selection was found to be improper. On February 27, 1984, respondent retracted his plea of not guilty and entered a plea of guilty to the first count of the indictment charging him with embezzlement. On June 8, 1984, in accordance with a plea agreement entered into with the Hunterdon County Prosecutor's Office, respondent was sentenced to pay a fine of $750.

In pleading guilty to the charge of embezzlement, respondent admitted that he knew and did nothing to prevent Michael Gold, his older brother and senior partner in the Gold & Gold firm, from misappropriating public and private clients' funds from the law firm's trust accounts from January 30, 1978, through August 31, 1979.

More specifically, during the course of his testimony in the first criminal trial and the hearing before the Special Master, respondent stated that on January 30, 1978, he received a $25,000 check from his client, the Hunterdon County Board of Recreation Commissioners, and deposited same in the Gold & Gold trust account. These funds were to be used in the purchase of land known as the Alpaugh tract. However, upon receiving the closing documents, respondent found some of them to be improperly completed. There were also problems concerning title to the property. Consequently, the closing had to be postponed.

The County's funds should have remained on deposit in the trust account until closing or such time as disbursements were otherwise authorized. However, on numerous occasions between January 30, 1978 and August 31, 1979, the period covered by the indictment, the balance in the account fell below $25,000. By respondent's own admission, "the Alpaugh deposit, which came in on January 30, eight weeks earlier, the $25,000 was completely gone and out of the account by March 30."

In providing the court with a factual basis for his plea of guilty, respondent stated that

As to Count I, I will plead guilty to aiding and abetting my brother, Michael, knowing that Michael was misappropriating money from the trust account during the years 1978, 1979, even though I did not take the money myself, but I permitted Michael to take monies out of partnership trust accounts knowing that the monies belong [sic] to clients. I recognize that that would be aiding and abetting embezzlement.

Upon receiving notice of respondent's conviction, the District XIII Ethics Committee conducted an investigation into the acts and practices of the Gold & Gold law firm that gave rise to the criminal proceedings. During the course of this investigation it became apparent that, as early as November 1976, the law firm was experiencing numerous and frequent overdrafts of its general business account at the New Jersey National Bank. On November 30, 1976, the bank asked the firm to make alternative banking arrangements because the "situation of continuing and frequent overdrafts cannot be tolerated." The bank advised the firm that effective December 13, 1976, it would no longer accept deposits to the firm's account. Contemporaneously, respondent was also aware of a frequent overdraft condition in the firm's other general business account at Town and Country Bank.

From the inception of their joint practice respondent's brother, as senior partner, ran the office, directed the bookkeeper, met with the accountants and assumed responsibility for the maintenance of the firm's bank accounts. However, in early 1978, given the serious overdraft conditions in the firm's business accounts, respondent directed the bookkeeper to cease using the firm's business account. Respondent instructed her instead to conduct all business and process all transactions through the firm's primary trust account.

According to respondent, this merger of the firm's business and trust accounts was necessary because his brother was constantly drawing checks out of the general business account without any regard for the balance therein. As he stated,

What I wanted done was the, the bulk of the fees be deposited in the trust account so that they could be monitored. I felt that this was a reasonable way of controlling Mike's going to the bank and simply writing out checks without regard to what was there.

Therefore, respondent decided

that the fees that were coming in on a weekly or monthly basis were to be deposited directly into the trust account. I did that for a series of reasons. One, I knew the accountants had been going, checking the—and balancing the trust account. So I knew that the funds would—could in effect be identified. It was our own money that we were putting in the trust account. I did not consider that a violation of any sort, and it gave a way of monitoring and trying to solve this problem with the general account. It was really the only way I saw to control the fees.

Having made and implemented the decision to merge the firm's accounts, respondent issued numerous checks representing payment of both law firm and personal obligations. He also drew checks payable to himself or cash. His brother continued to do the same.

Additionally, upon receiving the proceeds of loans obtained from clients in order to satisfy his partner's obligations and ultimately eliminate shortages that turned up in the firm's trust account, respondent deposited said funds in the trust account and made disbursements therefrom. Evidence adduced at the hearing disclosed that these lender clients were not advised to retain, nor were they represented by, independent counsel. However, all such loans were repaid without any loss to the clients in question.

Although the law firm had purchased the safeguard or one-write bookkeeping system in or about 1968, "the girl started for a while and then got away from it and just didn't do it.... The journal and the other things [the secretaries] would write up periodically and wasn't kept on such a basis that you could look at it any time." In fact, there were periods when the balances were not calculated for weeks at a time.

When bank statements, tax notices and other financial papers came in, they were simply placed in a box for the accountants' review during what were supposed to be quarterly visits. However, respondent acknowledged that it was "not every quarter. Sometimes it would be semi-annual or an annual statement [sic] come in, and balance the account, in such a fashion they would

show the total on deposit in the various trust accounts." As a general rule, respondent "didn't pay that much attention to it. I assume [the accountant] went through the bank statements, reconciled them and went through the various books. I'm really not sure exactly what he did." The accountants generally discussed their work with respondent's senior partner if he was available. If not, they would leave and discuss their findings with him at a later date. At no time did respondent participate in or attempt to familiarize himself with the accounting process. Rather, he allowed all trust account oversight functions to remain with his older brother. Consequently, "... if there were an overdraft shown on the trust account, it never came to my attention, as we never had a trust account check returned...."

However, the trust account was out of trust as early as November 30, 1977, and as late as July 31, 1980. Respondent testified that $67,139.59 should have been on deposit in the account on November 30, 1977. The actual amount on deposit was $14,060.74. Therefore, the account was $53,078.85 out of trust. According to an independent auditor, on July 31, 1980, the shortage in the account amounted to at least $125,933.73. Respondent and his brother continued to make disbursements out of the account for personal obligations and expenses throughout this period of time.

On June 14, 1984, approximately one week after the entry of the Judgment of Conviction, pursuant to *R.* 1:20–6(a)(1), the Supreme Court of New Jersey temporarily suspended respondent from the practice of law.

After six weeks of hearings, the Special Master sustained the first five counts of the complaint and concluded respondent had violated *DR* 1–102(A)(3), (4) and (6), *DR* 1–103(a), *DR* 5–101(A) and *DR* 9–102. He further concluded that Counts Six, Seven, Eight and Nine were not sustained by clear and convincing evidence and recommended dismissal of same. Count Six concerned disparities in respondent's testimony before various judicial and ethical bodies over the course of several years. Count Seven concerned respondent's failure to submit a final accounting of his trust account activity for the period April 1 through June 14, 1984. Count Eight concerned further minor discrepancies in the trust account during the first quarter of 1984. Count Nine addressed respondent's general fitness as an attorney.

As the result of his findings on Counts One through Five, the Special Master recommended that public discipline be imposed. The Special Master recommended a penalty less than disbarment. He concluded that respondent's partner was "the perpetrator and beneficiary of the defalcations" and that respondent did not directly benefit therefrom. Judge Quinn further found that the committee "did not establish by clear and convincing testimony that respondent used clients' funds for his own purposes because of the chaotic situation which respondent created by commingling trust funds with the firm funds, it was nearly impossible to demonstrate that any withdrawals made by respondent during the two year period were against clients' funds rather than earned funds of the partnership." He noted in further mitigation that respondent pauperized himself in order to make restitution to the victimized clients. [Transcript references and footnotes omitted.]

Based on its review of the record, the DRB found respondent guilty of unethical conduct, but concluded that respondent's suspension since 1984 was sufficient discipline. The DRB's conclusion and recommendation was:

Upon independent *de novo* review of the full record, the Board is satisfied that the conclusions of the Special Master's that respondent is guilty of unethical conduct are supported by clear and convincing evidence. The Board concurs with the Special Master's analysis of the Disciplinary Rules and Rules of Professional Conduct which were violated.

The Board is unanimous in its conclusion that public discipline is warranted. There is a division, however, as to the quantum of discipline deemed appropriate in this matter, which is discussed more fully in the separate conclusions of the majority and minority.

The Board has carefully reviewed the record in order to determine independently whether respondent had knowingly misappropriated any client funds. The Board majority finds no evidence that respondent committed a knowing misappropriation.

Because of the "dire consequences which may follow" from a finding of unethical conduct against an attorney, such a finding must be sustained by clear and convincing evidence. *In re Pennica,* 36 *N.J.* 401, 419 (1962). See *In re Sears,* 71 *N.J.* 175, 197 (1976); *In re Rockoff,* 66 *N.J.* 394, 396–397 (1975); *In re Hyett,* 61 *N.J.* 518, 520 (1972). To recommend the imposition of discipline, each Board member must hold "a firm belief or conviction as to the truth of the allegations sought to be established" enabling him or her to find, without hesitancy, the truth as to the facts in issue. *Aiello v. Knoll Golf Club,* 64 *N.J.Super.* 156, 162 (App.Div.1960). See *In re Boardwalk Regency Casino License Application,* 180 *N.J.Super.* 324, 339 (App.Div.1981).

The Board majority has applied these standards in determining whether the record before it demonstrates clearly and convincingly that respondent misappropriated client funds and, if so, whether his dereliction was a knowing one, warranting the most extreme disciplinary sanction.

Misappropriation is "any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom" *In re Wilson,* 81 *N.J.* 451, 455 n. 1 (1979). The misappropriation that will trigger automatic and almost invariable disbarment "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *Matter of Noonan,* 102 *N.J.* 157, 159–160 (1986).

The focus of all of these cases as well as a plethora of other disciplinary opinions is that for disbarment to be warranted a finding is necessary that the misappropriation was *knowingly* made. In determining whether a knowing misappropriation has occurred, the Board is mindful that "[i]t is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using client's trust fund. Lawyers have a duty to assure that

their accounting practices are sufficient to prevent misappropriation of trust funds." *Matter of Fleischer, et al.*, 102 *N.J.* 440, 447 (1986). "... (P)oor accounting should not, and does not, establish a *Wilson* defense, ... but poor accounting is not a *Wilson* violation absent evidence of a knowing misappropriation." *Matter of Simeone*, 108 *N.J.* 515, 521 (1987). Additionally, inattentiveness, laziness, or lack of due diligence should not be regarded as conduct sufficiently egregious to warrant disbarment. *Matter of Noonan, supra*, 102 *N.J.* at 161.

Based on this record, the Board majority is unable to conclude that the evidence before it is of a character so clear, direct, weighty, and convincing to enable it, without hesitancy, to conclude that a knowing misappropriation has occurred.

Respondent did not knowingly create a system designed to blind him from misuse of trust funds. As the junior partner, his brother still maintaining liaison with and control over the accountants, respondent attempted to put controls, albeit ill-advised, on what he perceived to be a bad business situation. Caught between fidelity to his firm's clients and loyalty to his older brother, he attempted to assist both and helped neither.

Due to the severe consequences which the *Wilson* rule invokes, it is of paramount importance to note that this unfortunate commingling began in 1978. Like a snowball rolling downhill it continued into 1980, when his brother wrote a large trust account check which could not be honored. Nonetheless, the Supreme Court has said that due to the intended deterrent effect of *Wilson*, it need not be applied retroactively. *In re Smock*, 86 *N.J.* 426 (1981). Respondent's actions, however misguided, were undertaken long before 1980. To hold respondent to standards established by the Court subsequent to his actions would be patently unfair.

Respondent has attempted to undo his errors at great personal cost to himself. To his credit he has pauperized himself to repay all of the misappropriated funds by selling off assets and obtaining loans from family, friends and commercial lending institutions. Following his suspension, he worked in a service station and convenience store in order to support his family and ensure that his clients were repaid. The record does not support a conclusion that respondent's conduct was based on dishonesty, venality, corruption or immorality. *Matter of Templeton*, 99 *N.J.* 365, 376 (1985). He attempted to act responsibly. Respondent constructed a "bizarre state of affairs" from which he could not extricate himself. *Matter of Johnson*, 105 *N.J.* 249, 258 (1987). In this case

> [T]he evidence about respondent's state of mind is no more compelling in the direction of knowledge than it is in the direction of unhealthy ignorance; and before we will disbar on the basis of a lawyer's knowing misappropriation, the evidence of that knowledge must be clear and convincing. *Id.*

Respondent's service to the community and the bar should not go unnoted. Respondent has served as a trustee of the Flemington Lions Club, member and vice president of the Flemington–Raritan School Board and is a past president of the Hunterdon County Bar Association. The Board majority has also considered that a substantial number of witnesses including a former county

court judge and state senator, a federal magistrate, the mayor of Flemington and business associates testified to respondent's character and reputation in the community at both his criminal trial and the hearing before the Special Master.

Consequently, the Board majority has concluded that knowing misappropriation, particularly for the limited six-month period in 1980, has not been established by clear and convincing evidence. Therefore, the Board majority recommends that respondent's temporary suspension since June 1984 be deemed sufficient discipline in this matter.

### Writing for the dissent, one board member wrote:

It is not without a sense of compassion that I register my dissent in this matter; I just cannot reconcile precedent with the equivalent of a four-year suspension recommended this day by the Board.

In 1978, respondent designed for his two-man firm an accounting system that commingled funds from the firm's operating account with trust account funds for the purposes of (a) "monitoring" his brother Michael's penchant to overdraw the operating account, and thus (b) avoiding the same type of shortages that had characterized the operating account when it was properly segregated from the trust account. From then on through the first one-half of 1980, and despite strong suspicions about his brother's defalcations, respondent chose to remain "ignorant" and decided not to monitor the combined account he had created. Such an acknowledgment of willful ignorance was the very essence of respondent's plea of guilty to aiding and abetting embezzlement. *See generally In re Skevin,* 104 *N.J.* 476, 486 (1986) (an attorney may be viewed as acting knowingly when he is aware of the highly probable existence of a material fact but chooses not to satisfy himself that it in fact does not exist).

Disbarment is mandated for deliberately commingling business and trust accounts to pay for personal and office expenses. *In re Fleischer,* 102 *N.J.* 440, 447–51 (1986). Respondent's guilt is equal to that of his brother. *See N.J.S.A.* 2A:85–14 (replaced by *N.J.S.A.* 2C:2–6). The misconduct of respondent continued into 1980, and triggered the strict standards of *In re Wilson,* 81 *N.J.* 451, 456 (1979). *See In re Goldberg,* 109 *N.J.* 163, 168 (1988). Whether clients suffered a loss or respondent secured pecuniary gain from the misappropriations matters not. *See In re Wilson, supra,* 81 *N.J.* 457–59.

At the crux of the conflict between the majority and dissenting DRB opinions is the interplay between our decisions in *In re Wilson, supra,* 81 *N.J.* 451, and *In re Fleischer,* 102 *N.J.* 440 (1986). In brief, *Wilson* holds that disbarment will invariably follow from a knowing misappropriation. As the rule has evolved, such a misappropriation "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *Matter of Noonan,* 102 *N.J.* 157, 160 (1986). We

have relaxed the rule for misappropriations that occurred prior to the publication of *Wilson. In re Smock*, 86 *N.J.* 426 (1981).

In a case such as the present one, *Wilson* must be read in conjunction with *Fleischer*, in which we disbarred three law partners who commingled their trust account and their operating account into a combined account from which they paid their client and personal obligations. 102 *N.J.* 440. On several occasions checks on the account were returned unpaid for "insufficient funds." *Id.* at 444, 448. Although one of the three partners in *Fleischer* "was primarily responsible for the firm's disbursements, all three respondents knew of and participated in the misappropriation." *Id.* at 441–42. Fleischer admitted that a bounced trust-account check demonstrated his awareness that there were insufficient funds in the trust account. *Id.* at 448. We found that the unauthorized use of their clients' funds constituted a knowing misappropriation, stating:

> We are not confronted here with an isolated or even an occasional bookkeeping mistake. Respondents admitted to a conscious joint decision to stop using their operating account and start using their trust account to pay all disbursements, including operating expenses. It is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using clients' trust funds. Lawyers have a duty to assure that their accounting practices are sufficient to prevent misappropriation of trust funds. Former Disciplinary Rule 9–102, which was in effect at the time of respondent's misappropriations mandated the deposit of trust funds in a separate account, prohibited commingling of those funds with other funds, and required the maintenance of appropriate records. The same requirements have been carried forward into Rule of Professional Conduct 1.15. [*Id.* at 447.]

Here, the DRB majority was mindful of those requirements, but found that respondent "did not knowingly create a system designed to blind him from the misuse of trust funds." In reaching that conclusion, the DRB majority was moved by the facts that respondent's partner was his older brother, that the commingling of the trust and operating accounts antedated *Wilson*, that respondent "pauperized himself" to see that his clients were repaid, and that in the past he has performed various forms of public service.

Although the dissenters also viewed the record with compassion, they believed that they were compelled to vote for disbarment. The dissenters felt so compelled because the single account into which respondent had combined the firm's business and trust accounts in January 1978 frequently contained insufficient funds to meet the firm's trust obligations. The deficiency continued until June 1980, when an audit by the Office of Attorney Ethics uncovered the misappropriations.

At the outset, we are confronted with the findings of the Special Master, who found:

> Although the testimony was that respondent's partner, Michael Gold, was originally charged with handling the firm's accounts, respondent had equal access to the accounts and it was respondent who directed the closing of the firm's business account and that all funds coming in, including earned fees go into the trust account. Respondent's testimony was that he did this in order to effect, "Better control". Respondent testified that there were no indepth audits performed by the firm's accountant and that no employee of the firm attempted to reconcile the trust account to the bank statements. The net result was necessarily chaotic and a great many checks drawn from the trust account could not be identified to any particular client's interest. The evidence on three counts, largely undisputed, establish by clear and convincing testimony that respondent was guilty of violating D.R. 9-102, D.R. 1-102(A)(3), (4), (6).
>
> In making this finding, the proponent did not establish by clear and convincing testimony that respondent used clients' funds for his own purposes[.] [B]ecause of the chaotic situation which respondent created by commingling trust funds with the firm funds, it was nearly impossible to demonstrate that any withdrawals made by respondent during the two year period [1978 to 1980] were against clients' funds rather than earned funds of the partnership.

Both the DRB majority and the respondent rely on that part of the Special Master's findings in support of the argument that he did not commit any knowing misappropriation. The difficulty with that argument is that the Special Master made those findings two months before the publication of our decision in *Fleischer*, in which we held that lawyers could not design a bookkeeping system to permit invasion of their trust funds and then assert that because of that system, it was impossible for them to know whether they were invading those funds when they drew checks on the account. *Matter of Fleischer, supra,* 102 *N.J.* at 447. In that context, we declined to distinguish between the partners who actually drew the checks on the trust

funds and those who knew of the system and the existence of bounced checks. We concluded that "[i]n the absence of any explanation by respondents, the overdrafts of the trust account establish misappropriation of those clients' funds." *Id.* at 449.

■ The record before us establishes that respondent combined the trust and business accounts in 1978 as a means of monitoring his brother's practice of overdrawing the business account. Both before and after the date of the *Wilson* decision, the combined account was out of trust. Respondent, however, was unaware of any misappropriation until he returned from a Florida vacation in July 1980. Our review, moreover, leads us to conclude that the record fails to establish by clear and convincing evidence that respondent knowingly misappropriated funds after the publication of *Wilson.* His guilty plea does not establish that fact. Respondent pled guilty to "aiding and abetting my brother, Michael, knowing that Michael was misappropriating money from the trust account" for the period January 30, 1978, to August 31, 1979. Because of the prospective application of *Wilson*, this plea is not sufficient to subject defendant to disbarment.

■ We recognize that under *Fleischer* once respondent combined the trust and business accounts, he had a duty to assure that the account contained sufficient funds to meet the firm's trust obligations. Even if we impute to respondent knowledge that the account was out-of-trust, the evidence does not establish that respondent knew that checks drawn after *Wilson* were not covered by sufficient funds. Absent such a showing, we are not clearly convinced that respondent, as distinguished from his brother, should be held responsible for any deficiencies in the trust account. Indeed, the record does not contain any checks drawn by the firm in 1980. We are disinclined to disbar respondent without more persuasive evidence that after *Wilson* checks resulting in misappropriations were drawn by him or with his knowledge.

We are impressed, as was the entire DRB, with respondent's good works, with his substantial efforts to assure that no client suffered any loss, and with his courage in facing the community. After working at a series of menial jobs to support his family, he has worked his way into a position of responsibility with a mortgage company. It was eleven years ago that respondent undertook his misguided efforts to monitor his brother's propensity to write bad checks. For five years, respondent has been suspended from the practice of law. We conclude that the public interest does not require that respondent be disbarred. Under the circumstances, we conclude that the public interest will be better served by limiting respondent's public discipline to the period of suspension that he has already served.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI, and STEIN—6.

*Opposed*—None.

## ORDER

STEPHEN GOLD of FLEMINGTON, who was admitted to the bar of this State in 1966, having been ordered to show cause why he should not be disbarred or otherwise disciplined, and the Disciplinary Review Board having filed a report with the Supreme Court recommending that the suspension of STEPHEN GOLD from the practice of law since June 14, 1984, be deemed sufficient discipline for his conduct;

And the Court having carefully considered the record, and good cause appearing;

It is ORDERED that the suspension of STEPHEN GOLD from the practice of law since June 14, 1984, be deemed sufficient discipline; and it is further

ORDERED that STEPHEN GOLD is now eligible to make application for restoration to the practice of law pursuant to *Rule* 1:20–11(h); and it is further

ORDERED that respondent shall continue to comply with the regulations governing suspended attorneys pending Supreme Court action on an appropriate restoration request; and it is further

ORDERED that STEPHEN GOLD reimburse the Ethics Financial Committee for appropriate administrative costs.